Mr. McDermott, when you're ready. Good morning. May it please the Court. Edward Patrick McDermott Sr., on behalf of Appellant Terry A. Cowgill. I'd like to start with the Court's decision below on the motion to dismiss, where the Court determined that the language of the EEOC charge did not provide sufficient notice for the employer. And the standard here, under Chaco, Judge Wilkinson, and other precedents, is that where there's notice to the employer of the scope of the allegations, where the EEOC, in its reasonable investigation, would uncover this, if it relates, indirectly can relate, then that's sufficient. So the background is that we have cases where, when people go to the EEOC, they don't check the box, let's say, for race, and then they allege a race claim when they filed initially an age case. This is an entirely different situation if you look at the language of the charge. And in the language of the charge, Ms. Cowgill identifies the exact acts that are acts of retaliation. The discipline, the discharge, the failure to accommodate. We have the same actors, the same time frame. It is wholly coextensive, but the box wasn't checked. I wasn't there. I doubt she filled out the form. But whether she filled the form out or not, there was sufficient allegation raised. I also think the record wasn't developed in making this decision. I understand how motions to dismiss are decided. But the reality is, is that we see that she communicated to the EEOC that she was retaliated against. We see in her communications with the EEOC that she goes over this retaliation. So obviously, the EEOC had a retaliation case, and they entertained it, if you look at that. Now, the court and some of the precedent has indicated that we should decide this on the face. So what we're doing is we're having a federal magistrate judge, who I don't know if it was ever an investigator. I know there's one person in the room here that was a federal investigator. And I can say that you would sit down and say, what happened? Why did it happen? Why do you think they did it? Those three investigatory questions. Maybe who, too? And when? And you ask those questions, you're going to get what she told the EEOC when she communicated with them. And the employer is on notice. Counsel for first aid will say why he believes they weren't on notice, and I'll be happy to rebut that. I'd like to move on to the accommodation. And here, if you look at the decision, the court confused the fact that Ms. Koga was allowed to get her therapy, physical therapy, with the clear record evidence that she requested time off. Okay. It's not clear to me what the requested accommodation was and where to find that. Did she request four-hour work days so that each work day would be reduced by four hours? Or did she request time off up to four hours per day as needed? She actually asked that she be given time off to heal. And that's clear from the record. She says that she talked to Dawn Rowe, said, Dawn, when are you going to put me on a schedule for less hours? And Dawn Rowe didn't do that. She said she went and looked at her schedule. And that's actually in the record. It's not about the physical therapy. And what first aid did, if you look at their argument. So what does that mean, less hours? Did she request four-hour work days every day of the week? Or did she request that she have reduced hours three to five days a week when she had appointments or pain or those sorts of things? She asked to be taken off the schedule, reduced hours of work. And the indication from what she said in her deposition was she talked to her doctor. She needed to heal. She also needed therapy. Let's not confuse the two. There's something called the interactive dialogue in the ADA. So just intermittent reduced hours whenever she needed for appointments or pain. That's what she requested as accommodation? No. She said she wanted reduced hours to heal. I don't know what that means. That's what I'm trying to get at. Maybe you could just point me in the record to where the request for accommodation is that crystallizes what it is she asked for. I'm not saying that she didn't. I'm just trying to find. Yeah, I need a JA site. I know you're about to give me her, I guess, her deposition testimony. That is correct. But where did you? JA, excuse me. Go ahead. JA 5939, 594, right? And the court in its decision decided that there was some kind of proactive obligation of Ms. Kogel when, in fact, under the Americans with Disabilities Act, when you say to your boss, I'd like accommodation, I want to be reduced off the schedule, the interactive dialogue begins. There's a duty to engage. That's what I'm trying to find, where the interactive dialogue began and what it was. In the court's opinion, it says plaintiff argues that because her schedule was never proactively reduced, defendant failed to accommodate her request. I disagree. There's no proactive doctrine here. There's a doctrine of interactive engagement under the ADA regs. Once you're on notice of a disability, the so-called burden shifts to you as a manager of people to say, what do you need? By the way, we never got to that point. So if anybody would ever ask me what exactly did she need, I would say had her supervisor engaged in the interactive dialogue, we would know today. But we don't. But we know this. She says, and given this approval, this is Mr. Jelinek questioning, can you tell me how or why you believe First Aid have failed to accommodate this request for a reduced schedule? Because every day I went in and checked my schedule and it wasn't reduced. So she says she went in and checked her schedule and it wasn't reduced. That's a concrete act, reduce my schedule. If you're asking me how many hours, my response to that would be that's not her job. That is not her duty to specify exactly. It is her job to say I'm disabled, I've been given this accommodation, and I need my hours reduced. And what Dawn Rose said to her was you can't miss work. So that's where it ended. Okay, I found it. She did provide from her health care provider, JA-288, that she needed to work a reduced schedule, four hours per day, three to five days per week. So she provided that to her employer, correct? That was the requested accommodation. That's at the very beginning.  I was trying to start from the beginning. And then we can move on, but we apparently can't do that. Well, I'm not talking about the leave management office where the communications occurred. And that can be very confusing. I am, though. Okay, the leave management office said you have this time, and then pursuant to company policy, you work it out with your supervisor. Okay. Right? And so she goes to her supervisor and says I need my schedule reduced because I've got this leave. And the supervisor doesn't do it. Now, there's something called power distance. What about this letter from the HR service center to her right after she requested that leave that says that it qualifies for leave and it's been approved starting January 15th, 2015, leave end date February 20th, 2015? What about that? And then gives what she must do as part of this dialogue, which is that employee on an intermittent leave of absence must attempt to schedule doctor appointments, let people know, that sort of thing. Did she do these things then? Yes, she asked. She says she asked. She said I want my schedule reduced. She goes to her direct supervisor. I want my schedule reduced. That's a request for accommodation. Is there specificity? The horrible hypothetical from first data is that if you took all the time that she theoretically wanted for her reduced schedule, she would never be at work. But you know what? So after the leave end date, which the leave end date for the first request was on February 20th, 2015, when did she next make an accommodation request? She said she made it continually. She said she would go to Dawn Row continually. She doesn't have the exact dates. Was there a time counsel that she asked for time off specifically and was denied it? Yes. She said I don't want to be on this schedule. I want my schedule reduced. And to me, that's asking for it. But go ahead. I appreciate that answer. I was asking a little different. Was there a day where she said I either need to go to therapy or I need some time off today in the next couple days because was there anything like that? I didn't see that. So I take it your answer, and if I'm wrong on that, please let me know. And if I'm right on that, it sounds like your answer is that her request to reduce her hours generally was sufficient. It was more than one request. It was a continual request. I've been approved for intermittent leave. I need my hours reduced. Dawn Row replies you have to be at work all the time. The hours weren't reduced. And Dawn Row didn't initiate a dialogue because what you do in Management 101 is you say how many hours do you need, why do you need it. It's called the ADA, the interactive requirement. You're not disputing that the company did approve the leave at least for the period January 15th to February 20th, 2015, are you? Our whole theory here is that her immediate supervisor canceled the accommodation clearly provided by the people who were the experts in the company. And I'm just asking about this first month, January 15th to February 20th, 2015. Where in the record can I find, other than some sort of document, where her supervisor canceled a request for leave that she may have had? Well, her testimony, she says. Right, that's her testimony. I was asking about a document, like a leave request, an email requesting leave, something like that. Well, she works in a call center. She's not an attorney. There's not a procedure that dictates that. There's no affirmative duty for her to do that. In the business world, people will come and talk. I think Chief Judge Gregory is trying to speak. I'm sorry. Counsel, I think the question to you was, is there anything in the record that would document what you're saying she said? And I'm just saying there is in the record, because the record says that they tried to put her on a, I guess what I would call a PIP type thing, because she had too many absences. So if it was scheduled, as she had requested, then they would have known that, but they had to come back. Am I correct in that the record said? Dawn came back and said, well, no, no, no, she really was. So if the schedule was there, then they wouldn't have put her, disciplined her. Didn't they try to discipline her? Yes, immediately. Because they didn't know, because there was no scheduled time given, correct? Isn't that right? Well. These are friendly questions. I understand that. I'm just looking at my time. And, yes, but more important is the idea that her supervisor, I just want to make clear when we say they, her supervisor canceled what the employer granted her by not allowing her to have the reduced schedule. Right. And you're correct. And it's exactly, that's correct. But my greater concern is that these two entities have been glommed together. The supervisor, who wants people to work no matter what and doesn't really care what corporate HR and leave management does. And that's what happened. She canceled it and refused to give it to her. And she doesn't have to send five emails or write a legal brief in the workplace. That's not how it works with regular working people. They talk to their boss. I don't think I was asking for her to write a legal brief in the workplace. I was just asking you to give me some sort of documented instance where she requested leave and was refused. And, again, in the records, her deposition testimony where she testifies to that and her affidavit where she says, I asked to have the schedule complied with per Chief Judge Gregory's question. And they wouldn't comply with the schedule that they gave me. But Judge Thacker gave you the answer that you need because Judge Thacker found in the record the official, what she asked for, was the time off, not just PRN, as they would say in pharmacy, but I want schedule time. And the point is, I guess from this record, it never happened. So much so that they didn't even know that she was authorized to be off during those times. As a matter of fact, something like nobody ships in at night, I guess. One side said, oh, she's not here. We don't know why or not. Then later Dawn had to come in. Am I correct in the record that says, oh, no, no, she was okay. She could be off. And then they roll back that, what's it, ADP or whatever it is? Some kind of improvement type thing. Well, I don't see it that way. The way I see it is that. Well, you see it your way. Go ahead. That's what, with all respect, is that I believe that her boss sent a shot across the bow by putting on a final written warning because how dare she get to leave. And the boss did the same thing with the discipline, the final written warning that led to her termination. Where the boss, the same day she's getting that same schedule accommodation, the boss goes and looks back and finds a tape and says, I'm putting you on final written warning. And the point there, of course, is that she jumped a progressive discipline scheme, which we see as a matter of a record. The evidence of other persons terminated. But number two, the judge, and this is really, really, really important that the judge missed the facts here. The judge below said that there was an independent determination that she had not done her job. That is not correct. In fact, the independent judge, the quality control center, passed her. And then basically it's like regrading somebody's homework. Her supervisor went back three weeks later. And by the way, what initiated that? Just like the first one that they withdrew, what initiated it was her request for accommodation again. So the supervisor, who's never done that before, she testifies, went back and listened to calls, found a call that had passed all scrutiny, and used that for the final written warning. There's animus and hostility to her leave. And that's why they refused to reduce her schedule. And to me, it's a blinding glimpse of the obvious. But I apologize, because sometimes I don't communicate as effectively as I should on such a blinding glimpse of the obvious that the immediate boss didn't like what top management did. They gave her time off. The boss wanted her at work every day. The boss then nailed her right away with a final written warning, which they don't do for anybody else. And they say, oh, you're a good guy. Watch your back. The fact was she was told by HR, you've got to protect your job. Now, why would you tell somebody, when you made a mistake, you've got to protect your job? That makes no sense whatsoever, if this is exactly as described as just counting leave here and there. So they warned her, you better protect your job. And, of course, then what happened, when she goes in to get recertified again, she gets nailed again. And, of course, there's a credibility resolution on the final call. And I want to make a point here in the record, and I can show you. Take it quickly, because you don't want to waste your time. Okay. I'll stop here.  All right. Mr. Jelinek. Good morning, Charles Jelinek. Charles Jelinek for Appalachia First Data. It's a privilege to be here today. This is my first time appearing in the Fourth Circuit, so it's wonderful to be here with you. And it's a wonderful courtroom. So thanks for having me here today. I'm going to start with the accommodation claim, because it seems like that's where the panel was most interested and focused. And let me just kind of summarize here, I think, what really the gist and the crux of this issue is. The sole accommodation request that was ever made here was just the FMLA request. There wasn't some ancillary request for accommodation. She didn't go through the accommodation request process. I asked her at her deposition, your whole claim regarding failure to accommodate is based on this FMLA request. And she says, yes, and my whole accommodation is based on that. And so what she — That was in the — that request was — she made that at the beginning, and it was approved based on that letter. But then there was another accommodation request closer to the time of her termination, wasn't there? Another request for FM — to be recertified for FMLA. So she — it wasn't really — she never styled it as, I'm seeking reasonable accommodation, let's engage in that process. She says, I'm applying for FMLA. And within days, the employer here approves it. And they say to her, and you noted it in the JA site here, it's 291, we're approving you to have this leave you've asked for. That's right. As your doctor said, you know — That's the lip service part of it. They did approve it. Now let's look at the terms of proof is in the pudding. Well, it wasn't lip service. What did they do? Well, what they did was they told her, when you need to take leave — well, first let's back up and — No, no, no, no. Right now, what did they do? You said they approved it. What did they do? They told her in the letter, when you need leave, this is how you do it. Engage with your local management. But they didn't give her what she asked for. They absolutely did. She did not. She did not ask for PRN. She said, I want schedule time off. Four hours between, like, two or four days. That's why she kept saying, where is my schedule? Schedule is not PRN as needed. It's a schedule. And it is shown in the record, because if she had a schedule, someone would have said from part A to part B, this lady is not here because she's on scheduled leave. It's because it's clear in this record it wasn't scheduled leave. They never gave it to her. That's why somebody was saying, why is she not here? And HR said, well, you're not here. You're in danger of losing your job. Then the person who should have scheduled it came in and said, oh, by the way, she was. But you better watch your back. And that's a good question counsel asked. Why would you have to watch your back when you had asked for scheduled leave and they didn't even know it? They were ready to put you on disciplinary action. And then afterwards when you had to come in and say, oh, no, she was right, I was wrong, but the parting epilogue was, you need to watch your back. Why? We don't know.  But the record is totally contradictory to her having a schedule because she said, I want a schedule. I don't want you to say, I have to come in and say, you know, today I don't feel bad. Okay, I'll let you go off. Schedule means exactly what it means in the dictionary, scheduled. But that's the issue because the health care provider who certified her for this intermittent or reduced basis leave, whatever you want to call it, she applied for intermittent leave. He said she needs to be off four hours a day for three to five days. So that's the rub. She wants us to interpret it as schedule me for this reduced basis leave. The company interpreted it as, well, we're going to let you take off as you need to. And that's okay. The law permits that. Because what else would have they done? Three to five days a week. Should have we scheduled her Monday, Tuesday, Wednesday, but not Thursday, Friday? Or how about Thursday, Friday, and Tuesday? Or how about two hours in the morning and two hours in the afternoon? The whole notion of the way she was asking it to be certified was... What about giving her a schedule and then finding out, does that work? You can't get to that until you give her a schedule. You're right. We gave her a schedule for Friday and Monday. But now we found out, and that's what the law talks about, interactive. It's in the middle of the week where she has most of her, she's symptomatic. So let's change it now to Tuesday and Wednesday. But if you don't have a schedule, we don't know. Because it never was, she didn't request PRN. She didn't say, can I be off whenever I don't feel well, my back is hurting? She said, no, schedule. And that's what the doctor read in the record. I've read it too. It's in the record that she asked for that for these days. And she never did. She said, when I'm going to get my schedule? You're not going to get a schedule. I'll let you off when you come and say to me you need off because of either back pain, I guess, or therapy or whatever. That's not a schedule. Well, as this court has held in the Ray Zuden case, which we cited in our papers and chatted about in our brief, the accommodation and how we give her the accommodation, it may not be exactly as she wanted it, but as long as it's effective. That's what the ADA says. We don't have to give her exactly what she wants or exactly what she requests, as long as the accommodation that the company provides. How is it effective here? It's effective because she said it was. The record evidence is replete with that, where she said, yes, on the occasions where I said, I got physical therapy or I'm not. I mean, she gave a very detailed account of one of the days where she said, I just couldn't do it anymore. I went in. I coded my time as FMLA. I got up. I put my coat on. My supervisor said, are you okay? And she says, no, I'm going home. I said, was there any consequence to you then? She said, no. If she was pleased with it, why is the record replete with, where am I going to get my schedule? Am I correct? Am I wrong about that? Didn't she continue to say, where am I going to get a schedule? And she never did. I don't think the record reflects that she continued to say that. She had an initial. Several times. Right? And she was told what the accommodation we're providing you is. You tell us what you have. This is what you're going to get. Is that reasonable, just because that's what you told her? It absolutely is reasonable, because in this case, it shows that it was. She came in. She worked. And when she felt like she couldn't work, she took off. It wasn't reasonable. People have to work. They have to eat and they have to live. If that was the rule, like, well, you came to work like I told you. I did it because I need to work. In spite of my back pain. That can't be the standard for the law. Or it must have worked because you came in. I came in with a back pain. With what my doctor said I needed. That would turn justice on its head in these cases. No one forced her to come in. She was told when her leave. No one forced her. Her needs forced her. Eating, living, in a home, putting gas in the car, which is very difficult. Well, whether she was granted leave or not or came in or not, she was paid by the hour. So if she took off the work, she wasn't going to be paid anyway. Can I ask you a question about the record of the leave request? Between the time the first intermittent leave request ended, which was February 20th, 2015, and the beginning of the second, which I think was August 15th, 2015, did she request any accommodations between February 20th and August 15th, 2015? She did not. All right. Then what are we to make of what happened when she was ultimately terminated that was so close in time to her second accommodation request? So putting it in the timeline, so the second accommodation request in August came after the July and August incident where she was placed on the improvement action plan. Then she requests to be recertified, and it's a very, very abbreviated request to be recertified. She's recertified for one or two days a month as she needs. It wasn't to be reduced schedule. It wasn't take me off the schedule two days. It was you may have off up to one to two days as you need it. And so what do we make of the next incident? Did it follow close in time? Yes. I mean, she requested recertification for her leave in August, and then she has this other phone call in September. But was this cooked up? Was this, as argued in their papers, that this was a dug-up thing? It absolutely wasn't. It was initiated by her own actions on the call that were reported by the caller. But we don't know what the call do. Do we have any? Where's the recording of the call? The recording of the call was not kept in the ordinary course and scope. Okay. It wasn't kept. It was so important to fire her for it but not to keep it. Well, again, they make much of it. How many years did she work for you? Approximately 10, 11 years. 10, 11 years, and she missed it. Not missed. She had a problem with one call, and you fired her? Problem with two calls within a 30-day period. Oh, my goodness. That really ratcheted it up. Two calls and 11 years of working for you, that occasioned her to be fired? Yes. They have very, very stringent requirements on how they want their callers. We've all made calls into call centers before, and we get people that we want to give us good, effective, courteous, responsive service, and they have policies. They're in the record. They say this is how we want our folks. Let's look at the call that you fired her for, the one call, only two. She didn't yell at anybody, right? No, she didn't engage at all. She didn't use any profanity, correct? Matter of fact, what was the call that some of the call disengaged and you could hear somebody in the background saying hello? Yes. Then she said, but on her end, it seemed like the call was disengaged. She couldn't hear anything. Wouldn't that be consistent? If somebody said hello, why would she keep the line open just to be silent? Wouldn't it be consistent that she can't hear the person saying what they were saying? Because it was open for 26 seconds later, right? Yes. So that's not a hang-up, is it? She didn't disengage because otherwise if she had disengaged, you wouldn't have heard the background talking, correct? Am I right? Am I wrong about your telephonic system? Yes. If she hung up, you would not hear anyone talking on the other side, correct? She did not. Is that right? No, is that right? I don't understand. I'm asking a very simple question. If she hangs up her phone, would you continue in your system to hear the other person talk? Well, no, technology-wise, I guess no, but that's not how their system works. I didn't ask you that. I asked you a simple question. You're saying that she disengaged because somebody was in the background still saying hello. That means she didn't hang up because if she had hung up, you would have had 26 seconds, right? No. She put him into the queue. It was 26 seconds. What's in the queue? She put him into the survey queue. That's how he came to be after the call. He did a survey and said, nobody ever greeted me, nobody ever spoke to me for 26 seconds. Oh, that was his survey. This is the caller's survey. The caller called. So he's saying something and she never greets him. There's no record evidence on that recording that both plaintiff concedes and Ms. Roe, the supervisor, said, I played this recording and there's no greeting from the plaintiff. By policy, they're supposed to say hello at least three times. Hello, hello, are you there? Before disengaging the call. How long was she on the phone? Apparently 26 seconds with never having said anything and she never says anything on that call, disengages the call, puts him into the survey queue. He gives a survey then that says, nobody ever addressed me, nobody spoke to me, and so I got bad service. Here's the point. I'm not trying to argue with you. It's just logic. Wouldn't it be consistent when she couldn't hear him? Because if he's saying hello, there would be 26 seconds of no one responding to him because apparently she couldn't hear him. Then likely he would not have heard her speak to him. She could hear him. How do you know that? She said that in the deposition. She said, I could hear this person speaking and I could hear something that seemed like there was talking in the background. And so the rub here is that. She said I didn't say a word? What? Did she say? She didn't say that, but she admitted that when the. What did she say? She admitted that when the call was played for her, when Ms. Roe played the call for her, she said, yes, I concede and confirm that when this was played, you cannot hear my voice anywhere on this call. I never greeted. I never spoke. There were no words. Her voice never appeared on that call. Did she say that? I never spoke. Yeah, she didn't say she never spoke. She said the recording confirmed that she didn't. And that's what we're talking about here. The supervisor can only look at it after the fact and say, hey, I've got this call on this. On this case, you fired her 11 years of service. Yes, they did. Right a month, less than a month after she asked for accommodation. Well, or approximately seven or eight months after she asked for her first accommodation. And she had a perfect evaluation a few months prior to her termination, correct? No. Well, her midyear evaluation in 2015 was a three, and three is the maximum. Yeah, but, I mean, that's putting aside the fact that she was on a 90-day improvement action plan that said don't engage in any more call avoidance, and then she did. How could she have? It seems like it's all the same time period. She's suddenly put on an improvement action plan about the same time that she's given a perfect performance evaluation of three. And then she makes another request for accommodation, and this one call happens, and she's terminated. I can't square in my mind, and maybe this is reason that there's a genuine issue of fact that should go to the jury. I can't square in my mind a perfect evaluation, and then a few months later, for the one call, she's terminated. Can you help me with that? I don't know that I would use the word perfect, and I can't remember exactly what the performance evaluation says. If you point me to it in the Joint Appendix, I'll take a look at it. But I can't get past in my head that she's on a 90-day. I mean, she couldn't have been having excellent performance in the summer. Rose said that at mid-year, Ms. Calgill was ranked a three. So mid-year to me is June at the latest. And a three in her evaluation, three out of three, that makes it a perfect evaluation. So let's say that she had that evaluation in mid-year. I don't recall exactly when it was. But then in July, July 10, 2015, she engages in the call that results in her being placed on the Improvement Action Plan. And then she receives the Improvement Action Plan in August. That's when she's put on the plan. So, yes, the timing is what the timing is. But at the end of the day, the district court determined that there was no evidence to show that the employer's reason for making the termination decision here was pretextual or false. Or that there was any other evidence suggesting that the true reason was her disability. That disability allegedly was the determinative factor here. And it points to a lot of things that he says are genuine issues of fact, but there are no genuine issues of fact on that. They've never put anything before the district court or here on appeal to suggest that that reason was not the true reason. Judge Gregory may disagree with it and think it's harsh. And you can have that opinion, but, you know, the decisions from the circuit are replete with the quote that you're not to sit as a super personnel department judging the fairness or wisdom of decisions that employers make. You're right. You're just to determine whether or not there was illegal discrimination here, and there was not. We're not the judges of humanity being maintained in a workplace. You're right. We're not. But we do look at things that are clearly before us. A person who worked there 11 years, and you represent your company, said two times the calls. And then at the mid-year, she had perfect records. Here to four, no problems. You said it was 11 years. And then she asked for re-certification of her disability, her problems. And then less than a month later, she's fired for this call that we just went through. And just listening to that, I mean, it's just we can't look at it. This is very recent. Those things we look at because we don't know. We don't know what's in someone's head. But doesn't it raise some serious questions? Not for me because I think the recency is a red herring. The recency would be as if she had an FMLA retaliation claim, which she did file and which was dismissed because it was time-barred. So if that was the claim we were looking at, perhaps. But the real timing is, I mean, is it so close in time to when she requested the accommodation or the FMLA request? Or is it when we became knowledgeable that she had a potential disability? The employer here knew she had a disability going back to January, or at least an alleged disability. And so we're waiting in the weeds to get rid of her temporally until September? There's just no evidence of that because it's blocked out and blocked out by we didn't initiate this. It was initiated by the caller who said I got bad service. In this record, why didn't you know that she was supposed to be off when you put her on the plan, the one you had to take back? Why didn't you know? Why didn't they know? It's not developed in the record. But we have to look at that. You said that to some suggestion of maybe animus. The record was, I mean, what the record says, I mean, actually what the record says, it was a mistake. Somebody accidentally counted those absences against her when it should have been FMLA qualifying. We have to believe that. Well, we don't have to believe it. We rescinded the discipline she got, and we said, sorry about that. You were right. We shouldn't have counted those absences against you. Because she had to bring it to your attention. Well, yes. Sometimes that happens. Sometimes, I mean, HR departments aren't perfect. Supervisors aren't perfect. They code something in, and she brings it to our attention and goes, hey, I've been approved for FMLA leave. You can't count that against me. And they say, hey, you know what? Ms. Colgill, you're right. We're going to rescind that. Sorry about that. That's exactly what happened. That's the record evidence on it. Plain and simple. I have one minute left of my time, so I do want to address the arguments he made with respect to the retaliation claim having been exhausted. It absolutely clearly was not. If you look at the face of the charge, I mean, he focuses much on we shouldn't be just looking at checking the box, and that's not our argument either. We're not just saying she didn't check the box. How long are recordings maintained in the regular course of business of FLA? I don't know. It's not in the record. I thought you said that this recording wasn't maintained because it wasn't part of the regular course of business. Yeah, it's a certain amount of time. She requested it in discovery. We went back to the employer and said, do you have it? And they said, no, we haven't maintained it, and we don't have those calls anymore. We only maintain them for a certain period of time. Even after they terminate somebody based on the call? Yes. So there's no anticipation of litigation at that point? Well, there was anticipation of litigation, I guess, because he makes much of this in his papers, and it's really kind of spurious, but he says they were on notice from the EEOC that they should have held on to this document, but the EEOC charge did not hit the company until October of 2017. They had some sort of internal snafu where they didn't process her charge all the way from the late 15 up to 2017, but it's absolutely clear in the record we did not get this charge until October of 2017. And she was terminated two years earlier. But you did know that you fired an 11-year employee who had perfect record scores for one incident, and you knew that would be the sine qua non of your case against her. You knew that then. You didn't have to wait for that. You knew that. I mean, anybody in HR would have to know that. My goodness. This wasn't a progressive thing. For the last five years she's been doing the same thing. When you cast all of your bread on the waters of one incident, and you fire an 11-year employee who's been otherwise perfect, that is not an issue of spoliation question. Because what else would you keep? Look, if you're going to fire this person for that, you better make sure we can document that call and that 26 seconds in that call. But you said just throw it away, right? You just don't know where it is, correct? Well, I'm sure they held on to it for whatever period of time they held on to it. But we didn't have notice of this. I mean, we can't hold on to every single call forever. The notice is you fired a person with what I just said, and a person who had requested leave. If that doesn't bring bells and whistles for anybody in HR, I mean, I don't know how HR will be in this environment. Well, first, Dr. Gregory, I disagree with the premise of your question that this was one incident. It started in July where she was admittedly rude to a caller and said, well, I'm not going to argue with you, and she hung up on the person. That's what got her on the IAP in the first place. Okay, that's one. And the second one was she was told, hey, in August, you have any more call avoidance, you're going to be terminated. But she wasn't put on the IAP in July when that call occurred. She was put on that a month later in August. Correct. Why was that? Why was there a delay of a month? Supervisors periodically go back and review calls. That's what they do in the normal course of their ‑‑ I think it coincided the same month that she asked for recertification. Right. Well, I'm pretty sure she asked for recertification after the IAP was delivered. I thought it was in August. I think it came after. The second one in August was? August 20th. August 20th. We put her on the IAP on August 4th. My time is up if you don't have any further questions. Thank you so much. Thank you. Mr. Dermott. Mr. Jellick, you have? Yes, the record reflects that in the same meeting when she was put on the final written warning, she was advised that her recertification request had been approved. Often when we look at conversations and disciplinary matters, why would you bring up a topic about approving leave at the same time you're telling somebody I'm disciplining you? Talk about mixed strokes or a signal? I think that's a ‑‑ yes, Judge Quartermile. If you say to somebody, look, I'm terminating you because of your job performance, but by the way, you've been hanging out with all the Spanish guys in the back. What's that all about? Then there's a suggestion that there's a little bit more going on. And that happens all the time. It happens all the time. My point on the tape that we should be very aware of here is it was requested by unemployment. Within the same timeframe that Roe was able to go back and find evidence to put my client on final written warning, at the same time that my client had passed quality control review on this call, that she then went and dug back up, she could find that call, but they couldn't find the tape that led to her termination. That's very suspect. Counsel didn't know how long they kept it, but I can tell you the record's pretty clear. It's the same timeframe. They had that call within that same timeframe for unemployment, and they refused to produce it. I think there's an inference there. But even better than that, Roe's affidavit at paragraph 43. What was the date of the unemployment? I have it, Your Honor. If it's in your briefs or something. Okay. Yeah, I have it actually written out here. It's just important to hit this here, because I think what's really important is we have two different stories from Roe about what was on the tape. So now I have a tape that disappeared. One of her stories in her affidavit at paragraph 43 says, on the recording of the call, a man could be heard talking in the background for approximately 26 seconds, and a man said hello just before Ms. Kogel disconnected the call. That's story one. Story two, she reported at the time she sought to terminate Ms. Kogel, is when the call begins talking, I hear a male talking in the background, a different male voice saying hello at 13 seconds into the call. These are two separate stories. I question the reliability of anything that Ms. Roe says, if she can't get her story straight about what she heard on this call that was subsequently destroyed. And the court therefore, when my client said, I made the opening, and they represented to the court that she admitted she hadn't made the opening. She admitted, because she's a very honest person, she said, Dawn played the tape, I don't believe she played the whole tape for me, but what I heard, I didn't hear the opening. She never admitted she didn't make it. That's an artificer misleading the fact finder. They also allege that she raised her claim in the 11th hour, when the record is replete with her saying this from day one. The court below was fooled. And the court missed that there were two separate stories on what the tape said. The court was fooled about her supposedly admitting. And by the way, counsel mentioned earlier that they just made a mistake the first time they issued her a final written warning. It was just a mistake. And we say, no big problem. But watch your back, Pison. Right? What does that mean, watch your back? When you have to watch your back? They didn't say Pison. But they told her to watch your back. Well, that's not a mistake. That's not where I come from. That was in February, right? Yes, that's when she first saw me. She had never had an infraction before that time, correct? Eleven years. What's to watch your back? That's what I couldn't understand. Well, I think it's clear. They wanted her to come to work every day because there's pressure on supervisors. Notwithstanding the progressive nature of other elements of the company, congrats to the leadership of the company, the HR department, the people who are trained, who are experts, who did the right thing. And I think that's what Judge Thacker was pursuing earlier was the idea that at that level, it was appropriate, the granting of the intermittent leave. And then it was canceled out by the person who then had to manage her every day. That person in that office, which probably may not even be in the same location, who knows. They're not aware of what's going on. The first request for intermittent leave, the letter had a terminus point, which was February 20, 2015. Between that time and then the August 20, 2015 request for accommodation, did she make any other requests? Or is this you're going to tell me about the definition again? The same answer I provided before. And, again, you have to remember that when she's told to watch her back, right, and she's trying to make a living, she's got a family, and her boss goes to her. And the watch your back comment was in February. Right when this first started. And she goes to the boss and says, I'd like my reduced schedule. And the boss doesn't give it to her. Now, you can, I guess, go hire a lawyer and suit a company. I guess you can do all kinds of things. But the average person does what the boss tells them to do. The boss won't give her the schedule. So she goes to work in pain. And, literally, she had to tap out. She was in such pain. I actually think that's an adverse employment action. In the case of first impression, does it materially alter the terms and conditions of a human being's employment when you force them to work under pain at the risk of losing their job? Is that in your complaint? We didn't plead, in the initial pleading, that. But I did argue direct evidence. I think that the threat by Wood to watch your back, contemporaneous with seeking this leave, is direct evidence. I also would note deviation from disciplinary procedure. Nobody ever put on final warning the first time. You've got somebody watching inappropriate video behavior. These are all short timers. And they get noticed. The one person gets two warnings. They get their desk moved. Two team leaders to help them. She did something where she didn't get any of the other consideration anybody else got. Now, why? All right? Like, what makes this night different than any other night? Well, I think the answer is pretty clear. It's that she sought leave, disability leave. And it was disability leave. And I want to point out, too, if you see in the record, their actual disability leave form contemplates short-term disability. So when you're filling out that FMLA form, it says, by the way, if you then have short-term disability. So if someone were to say, try to narrow the law in this remedial statute and try to use the FMLA to disqualify the ADA, right, I would just point out that the employer's own form contemplates disability in taking family medicine. So deviation from prior policy, two acts of timing, the first time she sought certification, then recertification, compared her evidence, or at least persuasive, if not technically, legally compared her evidence. The credibility resolutions by the court below, on as the courts really noted. This is really an issue for the jury. Our founding fathers recognized that. We can't have persons shading a story to one side or another when the fact is the jury needs to decide. People that actually work for a living, have bosses, have to go to the boss and ask for things, have to pay for their kids, are worried about their job. Thank you. Thank you, counsel, and thank you both for your arguments in this case. We'd love to come down and greet you as we would in our tradition, but we cannot. But no, nonetheless, we're happy that you're here and appreciate your arguments and wish you well and be safe.
judges: Roger L. Gregory, Stephanie D. Thacker, A. Marvin Quattlebaum Jr.